## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CAROL SBARBARO,<br>**Plaintiff,**<br><br>v.<br><br>REGULATORY DATACORP, INC., doing business as "RDC,"<br>**Defendant.** | CIVIL ACTION<br><br><br><br>NO. 16-4887 |

**DuBois, J.**                                                                                    **January 26, 2018**

## M E M O R A N D U M

### I.    INTRODUCTION

In this suit arising under the American with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C § 621 *et seq.*, plaintiff asserts claims against her former employer, Regulatory DataCorp, Inc. ("RDC"), for disability and age discrimination. Before the Court is RDC's Motion for Summary Judgment. Because no reasonable jury could find that plaintiff has rebutted RDC's proffered reason for her termination as pretextual, RDC's Motion will be granted.

### II.   BACKGROUND

The facts below are drawn from the record before the Court, which the Court construes in the light most favorable to the nonmoving party, as it must in a motion for summary judgment. *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). The material facts set forth in the record may be summarized as follows:

### A.    Plaintiff's Hiring by RDC

Plaintiff was employed by defendant RDC from sometime in May 2014 until November 14, 2014. Pl. Dep. Tran 71:12-21, 85:16-86:1; Beynon Dep. Tr. 19:3-7, 71:10-13. RDC

provides compliance and due diligence screening for banks, financial institutions and other customers, including background checks on individuals that it compiles from "over a hundred thousand media sources." Def. St. Mat. Facts ¶ 1; Pl. Resp. to Def. St. Mat. Facts ¶ 1.[1] RDC employs an "Inside Sales" team to market and sells its product to clients. Def. St. Mat. Facts ¶ 3. At all relevant times, the Inside Sales team was headed by John McGuigan, Global Head of Inside Sales. *Id.* In addition to McGuigan, the Inside Sales Team was staffed by about eight sales representatives known as Account Executives, who took primary responsibility for identifying clients, marketing RDC's products, and closing sales. Def. St. Mat. Facts ¶¶ 3-4. Plaintiff applied for a position as an Account Executive and was ultimately hired. Def. St. Mat. Facts ¶ 14.

During her hiring process, plaintiff disclosed her cancer, in remission since 2011, to multiple RDC employees. After a shared acquaintance provided plaintiff's resume to McGuigan, he contacted plaintiff for a phone interview. McGuigan. Dep. Tr. ¶ 26:3-27:1. During the interview, plaintiff told McGuigan that she was the top performer at her most recent employer and was proud to have achieved her performance while battling breast cancer. Pl. Dep. Tr. 44:12-21. Although McGuigan testified that he did not learn of plaintiff's cancer until later, he stated that she "performed well in the interview" and plaintiff was invited to interview in-person at RDC. McGuigan Dep. Tr. 26:23-24, 49:10-21; Pl. Dep. Tr. 46:16-48:6.

Approximately five days later, plaintiff interviewed at RDC and again disclosed her cancer. Pl. Dep. Tr. 48:20. Plaintiff interviewed with Chris Beynon, Vice President of Human Resources, and Josh London, Director of the Inside Sales Team. Pl. Dep. Tr. 48:20; Def. St.

---

[1] All citations to Defendant's Statement of Material Fact, Doc. No. 27-1, refer to undisputed facts and include the corresponding citation to Plaintiff's Response to Defendant's Statement of Material Facts, Doc. No. 28.

Mat. Facts ¶¶ 3, 18. Beynon testified that during her interview, plaintiff stated that she "was a proud cancer survivor and she doesn't let anything get in her way." Beynon Dep. Tr. 49:16-18. McGuigan testified that following plaintiff's interview, he spoke with Beynon, who stated that "she found out that [plaintiff] was a cancer survivor in the course of the interview and thought that was a good characteristic for Carol's candidacy for the position." McGuigan Dep. Tr. 49:18-21. Plaintiff's cancer had been in remission since 2011, and she has taken medication as a result since. Def. St. Mat. Facts ¶ 28.

Following her interviews with Beynon and London, plaintiff was offered a position as an Account Executive. Def. St. Mat. Facts ¶ 19. After negotiating her base annual salary from the standard $50,000 to $65,000, plus commission, plaintiff accepted. Def. St. Mat. Facts ¶ 20. Every Account Executive was expected to close enough sales annually to earn a commission of at least $300,000, which was prorated for Account Executives who joined RDC during the course of the year. Def. St. Mat. Facts ¶¶ 13. Plaintiff's prorated commission target was $125,000, equivalent to $1.25 million in sales. Def. St. Mat. Facts ¶¶ 23. When she accepted the position, plaintiff completed an Employee Personnel Information form, on which she stated her birthdate, showing that she was over 40 years old. Mot. Summ. J., ex. A, Doc. No. 27-4 at 10.

### B. Plaintiff's Treatment at RDC

After being hired, plaintiff encountered a number of frustrations at RDC. Plaintiff testified that McGuigan singled out older Account Executives, including by yelling at them during meetings. Pl. Dep. Tr. 116:1-7, 119:8-120:10, 163:10-164:4. Plaintiff also testified, however, that McGuigan would yell at older Account Executives "because of our sales" and denied that there were other reasons for his behavior. *Id.* 164:1-4. She also stated that McGuigan would yell at "[w]hoever was in the room on the team in front of [him] at the time"

and singled out John Balant and Matt Suskind, two Account Executives under forty years of age, for performance issues. *Id.* 116:2-117:20. When asked how much more McGuigan focused on older Account Executives, plaintiff testified, "I can't give you a percentage but it just seemed that, you know, in meetings we were criticized more or everything was more directed to you individually for whatever reason or to the next person individually for whatever reason. If you went over sales he would ask questions regarding it." *Id.* 119:17-22.

Plaintiff also testified that she was disadvantaged by the assignment of accounts. According to plaintiff, she received fewer sales leads from Gungho, a third-party marketing service that identified potential clients for Account Executives. Pl. St. Mat. Facts ¶ 7. She testified that at one point, she went six weeks without a Gungho lead. *Id.* ¶ 8. Although McGuigan testified that plaintiff received more leads over the term of her employment than other Account Executives, he nonetheless emailed Gung Ho on September 29, 2014, to obtain more appointments for plaintiff. Pl. Dep. Tr. 127:5-8; Mot. Summ. J., ex. P-15, Doc. No. 27-4 at 17. Plaintiff also testified that McGuigan reassigned existing accounts to younger Account Executives and gave them a disproportionate amount of new accounts. Pl. Dep. Tr. 130:2-133:1, 216:18-22

McGuigan testified that he never yelled at plaintiff or any other Account Executives, and that while he reassigned three of plaintiff's accounts, he only did so because they were large accounts better suited for an outside sales team or because plaintiff documented no activity on the accounts. McGuigan Dep. Tr. 40:11-43:17.

### C. Plaintiff's Performance and Termination

Although she was the third-top performer on the Inside Sales Team, plaintiff's sales were below RDC's expectations, she had problems documenting client interactions, and her sales

pipeline was generally below expectations.  Def. St. Mat. Facts ¶ 33.  On October 24, 2014, RDC

placed plaintiff on a performance improvement plan ("PIP"), which required plaintiff to:  close a

deal of value by November 7, 2014; build a pipeline of deals worth $50,000 for the fourth

quarter of 2014 by November 7, 2014; build a pipeline worth $400,000 for the first two quarters

of 2015[2]; and close deals with a total commission value of at least $50,000 by December 31,

2014.  Mot. Summ. J., ex. P-17, Doc. No. 27-4 at 20.  At the time, plaintiff had closed only two

deals for a total commission value of $4,500.  *Id.*

      Shortly after receiving the PIP, plaintiff met with Beynon.  Def. St. Mat. Facts ¶ 42.  At

the meeting, plaintiff stated that she was having difficulty with "unspecified medications," which

may have caused her to be forgetful.  Def. St. Mat. Facts ¶ 45.  Beynon assumed that the

medications were related to plaintiff's cancer, but testified that plaintiff did not expressly state

this.  Beynon Dep. Tr. 48:21-49:6.  Plaintiff testified, however, that she told Beynon that her

performance issues "potentially could be the result of chemo with [her] breast cancer."  Pl. Dep.

Tr. 73:20-22, 74:4-6.  According to Beynon, she offered plaintiff information on taking a leave

of absence and RDC's "disability program," which plaintiff rejected.  Beynon Dep. Tr. 45:20-

46:3.  Plaintiff, however, testified that *she* asked about the "ADA and FMLA" and stated there

was "potential" that she "may have to go out on short term disability for medical reasons," but

did not know when or if she might have to.  Pl. Dep. Tr. 73:3-18, 76:4-12.  According to

plaintiff, Beynon asked her to "keep her posted if [she] could not do [her] job for whatever

reason."  *Id.* 76:18-21.

      About a week later, in a regularly scheduled meeting, plaintiff told McGuigan that she

was "afraid" she might have a brain injury and was struggling "because of [her] medical

---

[2] The PIP does not state the ultimate deadline for this objective.

situation." Pl. Dep. Tr. 80:3-23. Plaintiff told McGuigan that she was under treatment. *Id.* 80:22. According to plaintiff, McGuigan then conveyed his father's own struggle with cancer, which plaintiff described as "somewhat sympathetic." *Id.* 81:4-17.

Following the meetings with Beynon and McGuigan, plaintiff did not meet all of the objectives in her performance plan: Plaintiff did not close a deal of value by November 7, 2014, and plaintiff testified that she would not have been able to build a pipeline of deals for the first two quarters of 2015 worth at least $400,000. Def. St. Mat. Facts ¶¶ 39-40. Plaintiff explained that she did not close a deal of value because deals "kept getting pushed out for a variety of multitude of reasons (*sic*)" and that the $400,000 pipeline was "unrealistic." Pl. Resp. to Def. St. Mat. Facts ¶¶ 39-40. Plaintiff was terminated on November 14, 2014, in a joint decision by McGuigan, Beynon, and Tom Obbermyer, the Chief Executive Officer of RDC, forty-seven days before the due date of the last objective in the PIP. McGuigan Dep. Tr. 93:1-94:9; Pl. Stat. Mat. Facts ¶ 52; Pl. Add'l St. Mat. Facts ¶ 44.

### D. Other Members of the Inside Sales Team

Other members of eight-person Inside Sales team were put on PIPs or terminated for poor sales performance, including two who were under the age of 40. The record contains no evidence that any Account Executive other than plaintiff was disabled. *Cf.* Pl. Add'l St. Mat. Facts ¶ 50.

Two Account Executives over 40 years of age in addition to plaintiff were terminated for poor sales performance around the time of plaintiff's termination. Def. St. Mat. Facts ¶¶ 56-57. Donna Rizzo, 58, was hired in May 2014 and terminated in December 2014 for a lack of sales production and lack of performance. Def. St. Mat. Facts ¶ 56; Beynon Dep. Tr. 21:9-24. Rizzo was placed on a PIP the same day as plaintiff, and around that time had closed only one sale for

$2,500.  Def. St. Mat. Facts ¶ 56; Resp. Mot. Summ. J., ex. P-6.  Kevin Gallagher, 53, was hired in June 2014 and terminated in September 2014.  Def. St. Mat. Facts ¶ 57.  During this time, he completed no sales.  *Id.* ¶ 57.  Neither Rizzo nor Gallagher were meeting RDC's sales expectations.  *Id.* ¶¶ 56-57.

Likewise, two Account Executives under 40 years of age were terminated for poor sales performance.  T.J. Brown, 22, was laid off in November 2014 or early 2015 for lack of sales production.  Beynon Dep. Tr. 23:13-24:3; McGuigan 68:15-22.  Similarly, Tyler Hoy, approximately 30, joined RDC in August 2014 and was laid off for "[l]owest production and performance on the team" in November 2014 or February 2015.  Beynon Dep. Tr. 25:5-24; McGuigan Dep. Tr. 17:7-19:2.  Neither Brown nor McGuigan met their respective sales goals.  Beynon Dep. Tr. 27:2-28:14.

Finally, three members of the Inside Sales Team who were under 40 did not meet their sales goal, but were not terminated.  Matt Suskind, 26, was hired the day after plaintiff and did not meet his sales goal in 2014 although he was the second-top performer at RDC with $35,875 in sales as of late October or early November 2014.  Def. St. Mat. Facts ¶ 26; Resp. Mot. Summ. J. ex. P-6; McGuigan Dep. Tr. 15:4-16:10, 32:6-8.  Suskind was not put on a PIP until after 2014 and is still employed at RDC.  McGuigan Dep. Tr. 15:5-16; Beynon Dep. Tr. 20:3-4.  Similarly, Jon Balant, approximately 28, began working at RDC in August 2014.  Beynon Dep. Tr. 20:9-10, 21:5.  Balant closed no business in 2014 and did not meet his sales goal for that year, but was nonetheless not terminated, although he was put on a performance improvement plan the same day as plaintiff.  McGuigan Dep. Tr. 15:14-17:15, 104:18-19.  McGuigan could not recall if Balant met the objectives in his PIP.  McGuigan Dep. Tr. 17:7-9.  Finally, Sean Golden, under 40 years old, began work at RDC in late September 2014.  *Id.* 11:20, 13:12-13.  McGuigan

testified that he had concerns over Golden's performance, and considered terminating him in

place of Brown; McGuigan retained Golden because he had a large deal in the pipeline.

McGuigan Dep. Tr. 67:20-69:22.

Plaintiff filed her Complaint on September 12, 2016. The Complaint set forth a claim for

disability discrimination under the ADA[3] and a claim for age discrimination under the ADEA.

RDC filed this Motion for Summary Judgment on December 22, 2017. RDC's Motion is ripe for

decision.

## III.   LEGAL STANDARD

### A.   Motion for Summary Judgment

The Court will grant a motion for summary judgment if "the movant shows that there is

no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A fact is

material when it "might affect the outcome of the suit under the governing law." *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that

a reasonable jury could return a verdict for the nonmoving party." *Id.*

The Court's role at the summary judgment stage "is not . . . to weigh the evidence and

determine the truth of the matter but to determine whether . . . there is sufficient evidence

---

[3] Defendant argues that there is no evidence in the record that it failed to provide plaintiff with a reasonable accommodation, because plaintiff never expressly requested an accommodation. Mot. Summ. J. at 6. The Complaint, however, does not expressly set forth a claim for failure to provide a reasonable accommodation, and plaintiff does not respond to defendant's argument in her Response. In any event, a plaintiff must show that she requested an accommodation to prevail on a failure to accommodate claim. *Armstrong v. Burdette Tomlin Mem'l Hosp.*, 438 F.3d 240, 247 (3d Cir. 2006). Plaintiff in this case has not done so, as the record shows that although she communicated her difficulties to defendant and discussed taking leave, she stated that her difficulty with medications "would rectify itself" and did not know if she would have to actually take leave. Def. St. Mat. Facts ¶¶ 45-46. There is no evidence of record that plaintiff requested accommodation. Thus, the Court does not address further any purported claim for failure to provide a reasonable accommodation.

favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249. However, the existence of a "mere scintilla" of evidence in support of the nonmoving party is insufficient. *Id.* In making this determination, "the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). However, the party opposing summary judgment must identify evidence that supports each element on which it has the burden of proof. *Celotex Corp.*, 477 U.S. at 322.

## B. *McDonnell Douglas* Framework

In deciding a motion for summary judgment on claims under the ADA and the ADEA, a court will evaluate the record using the burden-shifting framework articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). *Smith v. City of Allentown*, 589 F.3d 684, 689 (3d Cir. 2009); *Keller v. Orix Credit All.*, 130 F.3d 1101, 1108 (3d Cir. 1997). Under the first step of that framework, the plaintiff has the burden of establishing a prima facie case of discrimination, whether for disability or age. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). If plaintiff succeeds, the burden of production shifts to the defendant, who must "articulate some legitimate, nondiscriminatory reason for the employee's [termination]." *Id.* Finally, if the defendant meets its "relatively light burden" of production, the burden shifts back to the plaintiff, "who must now show by a preponderance of the evidence that the employer's explanation is pretextual (thus meeting the plaintiff's burden of persuasion)." *Id.*

## IV. DISCUSSION

In its Motion, RDC argues that plaintiff has failed to carry her burden of proving various elements of her prima facie case and of proving that RDC's proffered reason for terminating her was pretextual. Plaintiff, in turn, argues that she has provided sufficient evidence to show there

9

are genuine issues of material fact to warrant denying RDC's Motion.  Because the Court

concludes that no reasonable jury could find that plaintiff has rebutted RDC's proffered reason

for her termination as pretextual, RDC's Motion for Summary Judgment is granted.

### A.      Disability Discrimination

To carry her burden under the *McDonnell Douglas* framework, a plaintiff must first

establish a prima facie case of discrimination.  To state a prima facie case of discrimination

under the ADA, "a plaintiff must show (1) that he is disabled within the meaning of the ADA,

(2) that he is otherwise qualified for the job, with or without reasonable accommodations, and

(3) that he was subjected to an adverse employment decision as a result of discrimination."

*Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 185 (3d Cir. 2010).  The Court has decided that

it need not address plaintiff's prima facie case of discrimination and instead turns to defendant's

non-discriminatory reason for plaintiff's termination — namely, plaintiff's poor sales

performance relative to RDC's expectations.  The Court assumes, *arguendo*, that plaintiff has

presented a prima facie case.

Defendant argues that plaintiff was terminated because of her poor sales performance.

That performance is well documented in the record and the Court concludes defendant has met

its "relatively light burden" of producing a legitimate, non-discriminatory reason for plaintiff's

termination under the *McDonnell Douglas* framework.  The burden thus shifts to plaintiff to

rebut defendant's proffered reason for her termination as pretextual.

To rebut an employer's proffered, non-discriminatory reason for her termination as

pretextual, a plaintiff may carry her burden "by pointing to some evidence, direct or

circumstantial" from which a fact finder may reasonably either (1) conclude "that the employer's

articulated reason was not merely wrong, but that it was so plainly wrong that it cannot have

been the employer's real reason," or (2) "infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action," based on the employer's past discrimination of members of the protected class or favorable treatment of "similarly situated persons not within the protected class." *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 413 (3d Cir. 1999) (internal citations omitted) (internal quotation marks omitted). Under either alternative, the plaintiff carries the ultimate burden of persuasion to prove that her disability "played a role in the . . . decisionmaking process and . . . had a determinative effect on the outcome of that process." *CG v. Pa. Dep't of Educ.*, 734 F.3d 229, 236 n.11 (3d Cir. 2013) (omissions in original) (quoting *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 300 n.4 (3d Cir. 2007)).

Plaintiff raises three arguments that she has met her burden under each of these alternative routes, all of which the Court rejects.

First, plaintiff argues that RDC's favorable treatment of similarly situated, non-disabled comparators shows that discrimination motivated her termination. Plaintiff's argument fails because she can support an inference of discriminatory intent only by selecting some comparators while ignoring others. *Simpson v. Kay Jewelers*, 142 F.3d 639, 645 (3d Cir. 1998). A plaintiff cannot "pick out one comparator who was not [terminated] amid a sea of persons treated the same as her to establish a jury question." *Id.* at 646 (internal quotations omitted). There must be "evidence from which to infer discrimination apart from the fact that some members of one group are sometimes treated better and sometimes treated worse than members of another group." *Id.* at 646.

In this case, the record shows that RDC both retained and terminated non-disabled Accounts Executives. Plaintiff points out that RDC retained three non-disabled Account

11

Executives—Suskind, Balant, and Golden—to rebut RDC's proffered reason for her termination. As an initial matter, Suskin's sales performance, while below RDC's expectations, exceeded plaintiff's by several multiples, and this alone renders him an improper comparator for plaintiff. *Kay Jewelers*, 142 F.2d at 647 (in determining whether comparators are similarly situated, "the focus is on the particular criteria or qualifications identified by the employer as the reason for the adverse action"). Plaintiff further fails to acknowledge that, in addition to plaintiff, RDC terminated four non-disabled Account Executives—Rizzo, Gallagher, Hoy, and Brown—for poor performance. Thus, the record shows only that some non-disabled comparators were treated more favorably than plaintiff, and others were not. That evidence is insufficient to defeat a motion for summary judgment. *Kay Jewelers*, 142 F.3d at 646.

Second, plaintiff argues that RDC's proffered reason cannot be its real reason because she was terminated forty-seven days before the end of her PIP, despite her status as RDC's third-top performer and despite her completion of some of the PIP's objectives. However, plaintiff acknowledges that she failed to meet the PIP's requirement to close a single deal of value before November 7, 2014. Plaintiff, in fact, closed no deals between the implementation of the PIP on October 24, 2014, and her termination on November 14, 2014. The record likewise shows that she met only part of the third objective in the PIP, which required her to build a pipeline of deals for the first two quarters of 2015. Although plaintiff met some objectives of the PIP, her failure to achieve other objectives supports RDC's proffered reason for her termination, and plaintiff offers no reason why RDC was obligated to wait until the last deadline in the PIP to terminate her.

Third, plaintiff implies—but never expressly argues—that the temporal proximity between her termination and the meeting with Beynon after receiving her PIP shows that RDC's

proffered reason for terminating her was pretextual. Although temporal proximity may support a showing that a defendant's proffered reasons were pretextual, the "relative evidentiary impact of temporal evidence may vary depending upon the stage of the *McDonnell Douglas* proof analysis . . . . [E]ach case must be considered with a careful eye to the specific facts and circumstances encountered." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 n.5, 286 (3d Cir. 2000). In this case, RDC's concerns about plaintiff's performance predated her meeting with Beynon. Further, RDC relied on sales performance in a number of its other employment decisions. Consequently, it is not reasonable to infer that, despite its previously expressed concerns about her sales performance, RDC's real reason for terminating plaintiff was the revelation of her complications with medications during her meeting with Beynon.

Finally, the Court notes that RDC was aware of plaintiff's disability when they hired her. Although other circuits have created a presumption of non-discrimination where "the hirer and firer are the same," the employer knew of the alleged disability at the time of the hiring, and "the discharge occurred soon after the plaintiff was hired," the Third Circuit treats this situation as "simply evidence like any other." *Waldron v. SL Indus.*, 56 F.3d 491, 496 n.6 (3d Cir. 1995). In this case, plaintiff disclosed her history of cancer early in the hiring process, and the record shows that RDC considered it as a positive indicator of plaintiff's character. It is not reasonable to infer that RDC knew of plaintiff's alleged disability, hired her nonetheless, and then terminated her less than six months later because of that same disability.

Examining the evidence in the light most favorable to plaintiff, and resolving all reasonable inferences in plaintiff's favor, plaintiff's evidence does not raise a genuine issue of material fact. No reasonable fact-finder could find, by a preponderance of the evidence, that

RDC's proffered reason for plaintiff's termination—poor performance—was pretextual. Thus, RDC's Motion for Summary Judgment is granted on this issue.

### B. Age Discrimination

The same analysis applies to plaintiff's age discrimination claim. "When the plaintiff alleges unlawful discharge based on age, the prima facie case requires proof that (i) the plaintiff was a member of the protected class, i.e., was 40 years of age or older (see 29 U.S.C. § 631(a)), (ii) that the plaintiff was discharged, (iii) that the plaintiff was qualified for the job, and (iv) that the plaintiff was replaced by a sufficiently younger person to create an inference of age discrimination." *Keller v. Orix Credit All.*, 130 F.3d 1101, 1108 (3d Cir. 1997) (internal citations omitted). As above, the Court will assume, *arguendo*, that plaintiff has met her burden to establish a prima facie case of age discrimination. RDC has likewise met its burden of production to proffer a legitimate non-discriminatory reason for plaintiff's termination—namely, plaintiff's sales performance.

Plaintiff, however, has not rebutted RDC's proffered, non-discriminatory reason for her termination as pretextual. Plaintiff may carry her burden by presenting some evidence from which a factfinder could reasonably either (1) "disbelieve the employer's articulated legitimate reasons," *Fuentes*, 32 F. 3d at 764, or (2) find "by a preponderance of the evidence (which may be direct or circumstantial) that age was the 'but-for' cause of the challenged employer decision," *Gross v. FBL Fin. Servs.*, 557 U.S. 167, 177-78 (2009). But-for causation does not require proof that age discrimination was the only cause of an employer's action, but only that the adverse action would not have occurred in the absence of a discriminatory motive. *See Rumanek v. Indep. Sch. Mgmt., Inc.*, No. 12-cv-759, 2013 U.S. Dist. LEXIS 178912, at *22-23 (D. Del. Dec. 20, 2013). Plaintiff has done neither.

As with her disability discrimination claims, plaintiff argues that she has rebutted RDC's proffered reason by showing that RDC treated similarly situated individuals favorably and that it terminated her before the end of her PIP. She also relies on evidence in the record regarding the temporal proximity between her meeting with Beynon and her termination. Finally, plaintiff points to additional evidence in the record regarding McGuigan's treatment of older Account Executives. The Court rejects plaintiff's arguments.

First, plaintiff has again improperly selected specific individuals as comparators to support an inference of age discrimination. *Simpson v. Kay Jewelers*, 142 F.3d 639, 645 (3d Cir. 1998). Plaintiff points to the same three Account Executives as noted above—Suskind, Balant, and Golden—to show that RDC treated younger Account Executives favorably. As noted above, Suskin's sales performance far exceeded plaintiff's, rendering him an improper comparator for plaintiff. Although RDC terminated two Account Executives over the age of 40—Rizzo and Gallagher—plaintiff fails to acknowledge that RDC also terminated Brown and Hoy, both under the age of 40, for poor sales performance. On this record, plaintiff has not rebutted RDC's proffered reason as pretextual or proved that age discrimination was the "but for" cause of her termination. *See Smith v. City of Allentown*, 589 F.3d 684, 691 (3d Cir. 2009) ("Throughout this burden-shifting exercise [under *McDonnell Douglas*], the burden of persuasion, including the burden of proving 'but for' causation . . . remains on the employee.").

Second, the fact that RDC terminated plaintiff prior to the end of her PIP is not sufficient, for the same reasons stated above, to rebut RDC's proffered reasons for terminating plaintiff. Third, as above, the temporal proximity between plaintiff's termination and her meeting with Beynon is insufficient to show that RDC's proffered reasons for terminating her were pretextual.

Likewise, RDC was aware of plaintiff's age when they hired her. Plaintiff disclosed her age at the beginning of her employment on her Employee Personnel Information form. It is not reasonable to infer that knowing plaintiff's age at the time of her hiring, RDC terminated her based on her age less than six months later.

Finally, the Court turns to McGuigan's treatment of older Account Executives. The Court notes that plaintiff's testimony lacks specificity and is, at times, contradictory. Although she testified that McGuigan would single out older Account Executives for mistreatment, she could not specify how often that happened. Likewise, there is no evidence of record that McGuigan singled out any Account Executives or reassigned their sales accounts because of age, disability, or membership in a protected class. Moreover, plaintiff testified that McGuigan focused on sales or related issues in addressing Account Executives and, at least occasionally, criticized younger Account Executives as well. On this record, plaintiff has not rebutted RDC's proffered reason for her termination.

Again, examining the evidence in the light most favorable to plaintiff, and resolving all reasonable inferences in plaintiff's favor, plaintiff's evidence does not raise a genuine issue of material fact. No reasonable fact-finder could find, by a preponderance of the evidence, that RDC's proffered reason for plaintiff's termination—poor performance—was pretextual. Thus, RDC's Motion for Summary Judgment is granted on this issue.

## V.    CONCLUSION

For the above reasons, the Motion for Summary Judgment filed by defendant Regulatory DataCorp, Inc. is granted. An appropriate order follows.